UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
File Numbers:  5:07-CR-117-BR-2
5:08-CR-101-BR-2

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | DEFENDANT'S SENTENCING |
| | ) | MEMORANDUM |
| | ) | |
| MICAHEL YOUNG | ) | |
|     Defendant. | ) | |
| _____ | ) | |

NOW COMES the defendant by and through his counsel and submits the following for the courts consideration in the sentencing in the above-entitled action:

Mr. Young wanted to present a statement regarding his involvement with Mobile billboards and Michael Lomas:

"I am deeply saddened that people lost their investments in the business.  While I believe the business had the potential to be successful it was not managed properly and the misappropriation of funds by Michael Lomas prevented the company from obtaining the advertising revenue necessary to support the business and repay investors.

I would like to give a brief review of my background and involvement.

I was the oldest of five children and my parents were Catholic.  I attended Catholic schools from grade school to even my post graduate work at Georgetown University.  My father was a United States Marine and he raised me under his strong ethical and moral convictions (i.e. God, Country and Family).

After graduation in 1968, I started work as a national bank examiner with the Comptroller of the Currency (United States Treasury).  I spent six years with a focus on

international banking.  I was one of the first examiners sent overseas to examine U.S. Branches located in Japan and England.

I spent a year with First National Bank of Chicago where I was involved in international operational support where I would be sent to various branches and subsidiaries to resolve problems within the branch and subsidiary systems.  I then joined Security Pacific Nation Bank headquartered in Los Angeles California.  During the next seventeen years, I held various positions within the company related to lending, credit administration and merchant banking. While working for Security Pacific I was sent to work in the Philippines for three years in the Manila Offshore Banking Unit, I spent seven years in Australia where I helped grow the Australian merchant bank from a ten million dollar asset base to over 1.2 billion dollar asset base with virtually no loan problems.  Finally, I was sent to Canada where I held the position of chief credit officer, where I was tasked with repeating the success that I had attained in Australia.

In 1992 Security Pacific merged with Bank of America and I was forced to seek other employment.  Within a few months I was able to secure a position with the National Bank of Abu Dhabi in the United Arab Emirates.  I was in charge of their Washington D.C. subsidiary office for six and one half years.  I was made redundant at the age of 52 and again had to seek employment.

During my final year with the bank I was introduced to Michael Lomas through a business friend.  When I lost my position he approached me to help him with the payphone business that Mr. Lomas had started.  Mr. Lomas had started this business while I was still working for the National Bank of Abu Dhabi.

During the period of time I was forced from the bank and started working for Lomas I was separated and going through a lengthy and bitter divorce from my first wife. I had begun a relationship with another woman and had ended up having a child with her at the age of 54.

The divorce, losing my job, the new relationship and child put me under an extreme emotional and financial strain. Lomas approached me in the second half of 1999 to help him with the payphone business. While I had no experience or knowledge of the business I agreed to take a position with his company.

I spent most of the first year and a half assisting the then president, Bob Lane doing due diligence on the acquisition of the five or six payphone companies acquired by IPC/NPC. This was very time intensive going to various locations, checking the location contracts and the financial history for each telephone acquired. The telephones were located in New Jersey, Ohio, Pennsylvania, Washington D.C., Maryland, Virginia, North Carolina and Louisiana. The original structure was to manage the phones internally. The President, Bob Lane did not workout and Mr. Lomas hired a Pennsylvania company to manage the telephones.

During my time with IPC/NPC, I was not involved with personnel, cash management or funding the trust. All of these activities were handled in Newbury Ohio by Lomas. While working for IPC/NPC I had to use my personal credit for the company and Mr. Lomas used me to sign for the mortgage to purchase his condominium in New York City.[1] Lomas used my personal credit to establish cellular/land line telephone accounts and obtain a Gold Business American Express card for him and other employees of the company. My credit was used because the company was too new and Lomas had gone through personal bankruptcy.

---

[1] This condominium was later sold by Lomas for a profit of $150,000.00 which I never received any proceeds.

Looking back this should have alerted me to the type of person Lomas was. I had no equity stake in the company and my biggest asset was my resume. During this time I hated my position and had little desire to learn the inner workings of the payphone company. I stayed with it because of my personal crisis that was going on and hoped to secure a job back in the banking world.

Sometime in 2001 Lomas began to switch the phone company in to Mobile Billboards of America. Advertising was what I understood Michael Lomas' specialty to be. He allegedly had contacts within the advertising world and had a business contact in Georgia with a business plan. The telephone business was difficult with the emergence of cellular phone technology and the industry had problems. IPC/NPC was modeled after Mr. Edward's business plan. Mr. Edwards was later sent to jail because of something he had done. I am not personally aware of the circumstances of his case. These combination of factors led Michael Lomas to transform IPC/NPC into mobile billboards.

In 2000 Mr. Barry Maloney was hired as legal counsel for IPC/NPC. During this time IPC/NPC was looking for a trust company to allow IPC/NPC to take in 401K and retirement investments. Mr. Maloney was general counsel for the trust company. After Michael Lomas met Barry Maloney, Maloney was utilized by Lomas to restructure the telephone company to come into compliance with the Uniformed Franchise Offering Circular requirements. Maloney's position quickly became that of personal advisor to Lomas. Maloney handled not only the telephone company's legal affairs but assisted Lomas in setting up personal trusts and foundations.

The companies were restructured by Lomas and Maloney with the switch to mobile billboards due to begin with the launch to be in September 2001. Following the events of

September 11, 2001 the company launched however it failed to take of as initially anticipated as the economic environment was distressed.

In November 2001, I was laid off by Michael Lomas as the market would not support my overhead expenses and my personal problems had created problems at work. This action of letting me go confirmed my contention that I was not an integral part of any conspiracy.

I continued my search for a job within the banking industry or consulting in the D.C. area. In April of 2002, Lomas called and asked if I would come back to work for him now at MBA. Vince Barreca had opened an office in St. Louis. The job was contingent upon me moving from D.C. to St. Louis. I agreed for personal reasons and moved. My father had a stroke during heart surgery and the move home gave me an opportunity to help my mother in caring for my father. He died in August, 2003.

I moved in April of 2002. I initially worked for Mr. Barreca. Barreca was responsible for the sales agents. During this time I also worked with Barry Malone in putting together a formal compliance program to make certain that all agents complied with the Uniformed Franchise Offering Circular disclosure requirements. When Vince left the company in 2003 the major issue with MBA was the lack of advertising revenue. Lomas thought he could handle it and had hired a Vice President of Advertising. The VP spent one year marketing with little results. Until I was told by Lomas to fire the VP I had little involvement with the advertising.

While we never obtained any major advertising contracts the fact that we were out in the market bidding gave me confidence that we were finally in a position to obtain significant advertising income at the level required to finally get MBA to not rely on new sales to support the internal operating cash flow.

We were finally in a position in 2004 to obtain the contracts and not rely only on the UFOC sales to run MBA. The last critical piece was to hire a High Powered Sales Executive to obtain significant advertising. As part of the interview process for this position the individual was committed to bringing in nine million dollars of advertising revenue for the first full year.

The SEC in North Carolina sent the cease and desist order was sent and this was yet another problem for MBA. The Sales Executive then backed out. The opportunity to turn around MBA's advertising revenue was slight until the legal problems were resolved by Maloney.

The SEC filed suit against MBA and me in Atlanta. I was instructed by Alston & Byrd not to contact anyone associated with MBA and I supplied all the information requested by the SEC in that case. I immediately attempted to find a consulting position. I was able to get consulting work on a success only basis for Amteck Inc., a company in the polymer case ammunition business and a Canadian group known to me through my partner in CEO Capital. While CEO maintained an apartment/office in Virginia I effectively lived in Dubai since 2006 attempting to assist/introduce these companies in finding UAE partners for business ventures in the UAE through my contact developed during my banking days. During my time with them I was spending about six months a year in Abu Dhabi. In 2007 I learned that I had been indicted. I hired Bridgett Britt Aguirre. As the case progressed I was allowed to travel back to Dubai for business. I was checking in with my pretrial release office in Virginia on a weekly basis. I came back to North Carolina for the SEC Receiver Deposition then returned to Dubai with the approval of my probation officer in Virginia. I am sure that he got NC approval. I then contacted the pretrial services officer in Virginia who contacted the US Marshalls in NC. I called the US Marshall's Office in NC and was told someone would call me. During this time

there was confusion as to whether or not I was allowed to travel back to Dubai. Magistrate Judge Webb set a hearing to clarify the conditions of my release. However, I was unable to return.

I had no money. My "business" partner had returned back Canada. In January 2008, I tore my hamstring muscle. I reinjured my hamstring in February and was hospitalized for five days. After that I was bedridden over two months. This injury still gives me problems. I was evicted from my apartment and was forced to stay with my girlfriend.

I learned that the FBI had a fugitive warrant for my arrest. I then contact the pretrial services officer who then told him that he would be contacted. The FBI agent in Abu Dhabi contacted me and arranged for me to return to the U.S. As a condition of my pretrial release I assigned my Bank of America Pension as security. As this was my only asset forfeiture of it is devastating to me.

My career is gone, I have no employment prospects, I am $42,000 in arrears for child support. I am 62 years old. When released from prison I will have to pay restitution."

I.      Factors to consider at sentencing

In determining what sentence would be sufficient but not greater than necessary the court must weigh several factors:

A.      First, we look to the nature and circumstances of the offense.

The purposes set forth in § 3553(a)(2)(A) are generally referred to, collectively, as "retribution," which has been defined as follows:

> First, retributive, or "just deserts," theory considers only the defendant's past actions, not his or her probable future conduct or the effect that the punishment might have on crime rates or otherwise. Second, retribution examines the actor's degree of **blameworthiness** for his or her past actions, focusing on the offense

being sentenced. . . . Third, the degree of blameworthiness of an offense is generally assessed according to **two kinds of elements**: the **nature and seriousness of the harm caused or threatened** by the crime; and the **offender's degree of culpability in committing the crime, in particular, his degree of intent (mens rea), motives, role in the offense, and mental illness or other diminished capacity**.

Richard S. Frase, *Excessive Prison Sentences, Punishment Goals, and the Eighth Amendment: "Proportionality" Relative to What?*, 89 Minn. L. Rev. 571, 590 (February 2005) (emphasis supplied).

Thus, the seriousness of the offense may be lessened, for example, if the crime was victimless or was not violent. *See* 28 U.S.C. § 994(j) (prison is generally inappropriate in "cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense," while some term of imprisonment is generally appropriate for "a person convicted of a crime of violence that results in serious bodily injury"). The offense should be considered less serious if restitution was made in whole or in part, if the defendant's motives were not at all or not entirely egregious, if the defendant's knowledge or intent was diminished, if the offense was the result of a disadvantaged upbringing, abuse or neglect, poverty, addiction or mental illness, or if the defendant's role or gain from the offense was comparatively minor.

In this particular case, Mr. Young was not the master-mind of the criminal enterprise. Lomas was the one who truly caused the demise of the company. Lomas compartmentalized the business so that it was close to impossible for each division to know what was going on in the others. In fact, when Mr. Young learned that Lomas was pilfering the business, Mr. Young began to build up reserves for the company, of which Lomas was unaware. Mr. Young believed, and still believes, that MBA was a viable business. He contends that had the business been run differently, and not pilfered by Lomas, MBA would be a successful business.

B.      Next, the sentence must afford adequate deterrence to criminal conduct.

Indeed, while many believe that the higher the sentence, the greater the effect in deterring others, the empirical research shows no relationship between sentence length and deterrence. The general research finding is that "deterrence works," in the sense that there is less crime with a criminal justice system than there would be without one. But the question for the judge is "marginal deterrence," *i.e.*, whether any particular quantum of punishment results in increased deterrence and thus decreased crime. Here the findings are uniformly negative: there is no evidence that increases in sentence length reduce crime through deterrence. "Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

In one of the best studies of specific deterrence, which involved federal white collar offenders (presumably the most rational of potential offenders) in the pre-guideline era, no difference in deterrence was found even between probation and imprisonment. *See* David Weisburd et. al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).

Another problem with justifying punishment as a means to deter others, besides its ineffectiveness, is that it is immoral to punish one person merely to promote deterrence of others. "Juridicial punishment can never be administered merely as a means for promoting another good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, <u>The Science of Right</u> 195 (W. Hastie trans., 1790).

Mr. Young truly realizes and accepts that he has made an immense mistake. Mr. Young is a first time offender, who prior to his dealings with Lomas, had never been in trouble before. In the letters which the Court will receive, Mr. Young's friends and family make clear that Mr. Young is a hard-working and honest man with strong moral convictions. People who have known Mr. Young since high school have written this Court to attest to Mr. Young's good character.

This is a classic example of a case in which an extensive period of imprisonment is not necessary to deter the defendant from further criminal conduct. Mr. Young has already been incarcerated for a year. He understands the severity of his conduct and has truly accepted the consequences of his actions. An extended incarceration is not necessary to deter Mr. Young from criminal conduct.

C.      <u>The sentence must also protect the public from further crimes of the defendant</u>.

Of all of the purposes of sentencing, the need to protect the public from further crimes of the defendant is the one of greatest practical concern, and also the most capable of being measured.

The United States Sentencing Commission has published studies on recidivism showing that certain aspects of the guidelines overstate the risk of recidivism and that a number of factors that the guidelines prohibit or deem not ordinarily relevant are good predictors of reduced recidivism. *See, e.g., Cavera*, 550 F.3d at 186 (judge took account of "lesser need for specific deterrence" because of "the inverse relationship between age and recidivism"). The Commission has stated: "If, as the data indicate, abstinence from illicit drug use, or high school completion, reduces recidivism rates, then rehabilitation programs to reduce drug use or to earn high school diplomas may have high cost-benefit values."

There are studies on the risk of recidivism, with and without treatment, for certain kinds of offenders. The guidelines, which recommend prison in most cases, even for first time offenders, do not generally recognize differences in risk of recidivism or the efficacy of rehabilitation.

Studies show that the following factors – which the guidelines prohibit or discourage -- correlate with reduced recidivism:

Age: Age is a powerful component of recidivism prediction, which the Guidelines do not take into account. "Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.

Employment: Stable employment in the year prior to arrest is associated with a lower risk of recidivism (19.6%) than for those who are unemployed (32.4%).

Education: Recidivism rates decrease with increasing educational level (no high school (31.4%), high school (19.3%), some college (18%), college degree (8.8%)).

Family: Recidivism rates are lower for defendants who are married (13.8%) or were married but are divorced (19.5%) than if never married (32.3%).

Gender: Women recidivate at a lower rate (13.7%) than men (24.3%).

Abstinence from drug use: Recidivism rates are lower for those without illicit drug use in the year prior to the offense (17.4%) than those who used illicit drugs in the year prior to the offense (31%).

Non-Violent Offenders: Offenders sentenced under the fraud (16.9%), larceny (19.1%) and drug guidelines (21.2%) are the least likely to recidivate.

First Offenders: In 2004, the Commission reported that over 49% of federal offenders in 1992 had zero criminal history points; in 2001, that percentage was over 40%. First offenders are more likely to be involved in less dangerous offenses and their offenses involve fewer indicia of culpability, such as no use of violence or weapons, no bodily injury, a minor role or acceptance of responsibility.

They are also more likely than offenders with criminal histories to have a high school education, to be employed, and to have dependents. Further supporting alternatives to prison for this group is that offenders are most likely to recidivate when their sentence is straight prison, as opposed to

probation or split sentences. However "first offender" status is defined, the rate of recidivism (including reconviction, re-arrest or revocation) for first offenders is 11.7%, which is significantly lower than the rate of 22.6% for offenders with one criminal history point, or that of 36.5% for offenders with two or more criminal history points. The rate of reconviction alone is similarly much lower: offenders with zero criminal history points have a reconviction rate of 3.5%, those with one point have a reconviction rate of 5.5%, those with two or more points have a reconviction rate of 10.3%.

Mr. Young meets nearly all the criteria that decrease recidivism rates. Mr. Young is sixty-three years old. He is extremely well-educated and has an extensive work history. Mr. Young is a first-time offender with no history of drug use. Further, Mr. Young is a non-violent offender.

Additionally, Mr. Young has the overwhelming support of family and friends. Mr. Young has three siblings, each of which has written a letter to the Court on Mr. Young's behalf. Mr. Young's mother is also very supportive. She is eighty-three years old and is in failing health. Mrs. Young has indicated that she would like nothing better than for Mr. Young to come back to the family home in Illinois. Mrs. Young has a spare bedroom ready and waiting for her son. Mr. Young would be a true asset to Mrs. Young, by providing assistance to her in completing day to day tasks around her home.

D.     <u>A proper sentence must provide the defendant with needed educational or vocational training, medical care.</u>

Judges must now consider all of "the kinds of sentences available" by statute, § 3553(a)(3), even if the "kinds of sentence . . . established [by] the guidelines" permit or encourage only prison. *See Gall*, 128 S. Ct. at 602 & n.11. Probation is authorized by statute for a broad range of offenses and offenders, *i.e.*, for any offense with a statutory maximum below 25

years *so long as probation is not expressly precluded and the defendant is not sentenced to prison for a non-petty offense at the same time. See* 18 U.S.C. § 3561(a); 18 U.S.C. § 3559(a).

Further, the "kind of sentence" available is not just about prison versus halfway house versus home confinement versus probation. It includes whether and where "educational or vocational training, medical care, or other correctional treatment in the most effective manner," 18 U.S.C. § 3553(a)(2)(D), is available.

The Sentencing Commission has not adopted any theory of punishment based on sentencing purposes and has not explained its guidelines. Accordingly, judges and lawyers at the regional hearing urged the Commission to include in each guideline what purpose or purposes the guideline is meant to serve and on what basis the Commission concluded that the guideline would serve that purpose or those purposes.

As a matter of historical fact, most guidelines are based on the wishes of the Department of Justice (DOJ) and its allies in Congress.[2] DOJ has actively lobbied the Commission and Congress for lengthier sentences, on the theory that heavy penalties are needed to coerce cooperation and guilty pleas,[3] or to sufficiently motivate prosecutors.[4] Congress, to express

---

[2] "In some cases, the results of research and collaboration have been overridden or ignored in policymaking during the guidelines era through enactment of mandatory minimums or specific directives to the Commission." Fifteen Year Review at xvii. "To date the guidelines have been used, often pursuant to specific congressional directives, to increase the certainty and severity of punishment for most types of crime. They could, however, be used to advance different goals, that are also mentioned in the SRA." *Id.* at 77.

[3] *See, e.g.,* Rachel E. Barkow, *Administering Crime*, 52 UCLA L. Rev. 715, 728 & n.25 (Feb. 2005) ("prosecutors have an incentive to lobby for higher statutory maximums than even they themselves believe to be appropriate for the crime, just to enhance their bargaining power," and listing numerous examples of the Department requesting more stringent sentencing laws and guidelines because it would make prosecutors' jobs easier).

disapproval of crimes in the news, enacted mandatory minimums, increased statutory maximums, and issued directives to the Commission. Thus, the guidelines for the vast majority of defendants sentenced in federal court were based on congressional actions, guideline amendments initiated by DOJ, and concerns about what would be acceptable to DOJ and its advocates in Congress, rather than on the purposes of sentencing and other factors in § 3553(a) that judges are bound to consider.[5]

The Commission would likely say that the guidelines are based on the "seriousness of the offense" as expressed by Congress. Indeed, in its amicus brief in support of the government in *Rita*, Congress said that "[i]t cannot be the case that a sentence is unreasonably high under Congress's parsimony provision when Congress itself elsewhere made the choice for severity."[6] As its primary example, it explained that it "chose to 'link the quantity levels in the ADAA to guideline ranges corresponding to the five- and ten-year mandatory minimum sentences,'" and that "[h]ad the Commission 'given more weight to other potentially relevant factors, such as an offender's role within the drug trafficking organization,' then sentences under the Guidelines would not have reflected the seriousness of the offense as determined by Congress's mandatory

---

[4] For example, DOJ claimed that the prospect of a sentence without imprisonment was insufficient to motivate AUSAs to bring intellectual property cases. In support of a "trafficking" enhancement in § 2K2.1 based on two firearms, DOJ argued that firearms "traffickers" traffic in a small number of guns, *i.e.*, two, and often have no criminal history, so penalties must be substantially increased in order to "merit" the expenditure of resources to prosecute them. *See* DOJ Written Testimony at 3-4 (March 15, 2006), http://www.ussc.gov/hearings/03_15_06/Richard-Hertling.PDF.

[5] *See* Frank O. Bowman III, *The Failure of the Federal Sentencing Guidelines: A Structural Analysis*, 105 Colum. L. Rev. 1315, 1319-20 (2005); Marc L. Miller & Ronald F. Wright, *Your Cheatin' Heartland: The Long Search for Administrative Sentencing Justice*, 2 Buff. Crim. L. Rev. 723 (1999).

[6] Brief for the United States Sentencing Commission as *Amicus Curiae* in Support of Respondent, *Claiborne v United States* and *Rita v. United States* in the Supreme Court of the United States, Nos. 06-5618 & 06-5754 (January 22, 2007), at pp. 19-20.

Case 5:07-cr-00117-BR   Document 513   Filed 12/28/09   Page 14 of 21

minimum sentences."[7] This explanation utterly fails to recognize that the Commission was created as an independent expert body in order to avoid the influence of politics, and that when it acts as a junior varsity Congress, it raises the separation of powers problem that most troubled the Supreme Court in *Mistretta v. United States*, 488 U.S. 361 (1987), *i.e.*, that the Commission is "located" in the Judicial Branch, that the "legitimacy of the Judicial Branch ultimately depends on its reputation for impartiality and nonpartisanship," and that "that reputation may not be borrowed by the political branches to cloak their work in the neutral colors of judicial action." *Id.* at 407.

In any event, the guidelines express offense seriousness in terms of "harm," theoretically measurable in grams, dollars, number of victims, and the like, and then translated to a number of points and ultimately an often excessive number of months and years. At the same time, the guidelines generally ignore, exclude or minimize the offender's degree of culpability,[8] and explicitly prohibit, discourage or limit consideration of many factors that bear directly on culpability, risk of recidivism, and the need for or accomplishment of rehabilitation.[9]

---

[7] *Id.* at 20.

[8] Amy Baron-Evans, *The Continuing Struggle for Just, Effective and Constitutional Sentencing After* United States v. Booker at 9-10 (August 2006),

[9] *See, e.g.,* USSG §§ 5H1.1 (age); 5H1.2 (education or vocational skills); 5H1.3 (mental and emotional conditions); 5H1.4 (drug or alcohol abuse, gambling addiction, physical condition, including physique), 5H1.5 (employment record), 5H1.6 (family ties and responsibilities), 5H1.7 & 5K2.0 (d)(3) (role in the offense), 5H1.11 (military, civic, charitable or public service; employment-related contributions; prior good works), 5H1.12 (lack of guidance as a youth, disadvantaged upbringing), 5K2.0(d)(2) (acceptance of responsibility), 5K2.0(d)(5) (fulfillment of restitution obligations "only" to the extent required by law), 5K2.10 (victim provocation in a non-violent offense), 5K2.12 (financial difficulties and economic pressures on a trade or business), 5K2.13 (diminished capacity caused by voluntary use of drugs or other intoxicants, etc.), 5K2.16 (voluntary disclosure in connection with investigation or prosecution), 5K2.19 (post-sentencing rehabilitation efforts), 5K2.20 (aberrant behavior if serious bodily injury or

In 1999, Commission staff reported that average time served had doubled since the guidelines' inception, noted evidence that lengthy prison terms were being served by offenders with little risk of recidivism and without deterrent value, and recommended an evaluation of whether prison resources were being used effectively.[10] That same year, Justice Breyer gave a speech in which he criticized the "false precision" created by the guidelines, and called upon the Commission to "know when to stop," to "[act] forcefully to diminish significantly the number of offense characteristics," to "[broaden] the scope of certain offense characteristics, such as 'role in the offense,'" and to move in the direction of "greater judicial discretion" in order to provide "fairness and equity in the individual case."[11] Instead, with few exceptions, the Commission has continued to amend the guidelines in a "one-way upward ratchet increasingly divorced from considerations of sound public policy and even from the commonsense judgments of frontline sentencing professionals who apply the rules."

Mr. Young is not in need of the programs that many offenders take advantage of while incarcerated. Mr. Young is very well educated and has a great deal of work experience. Additionally, there is no indication that Mr. Young has substance abuse issues needing to be addressed within the Bureau of Prisons.

II.     Prison has greater significance for those imprisoned for the first time

---

death, used a firearm or other dangerous weapon, convicted of a serious drug offense, more than one criminal history point or any prior uncountable criminal history).

[10] Paul J. Hofer & Courtney Semisch, *Examining Changes in Federal Sentence Severity: 1980-1998*, 12 Fed. Sent. Rep. 12, 1999 WL 1458615 (July/August 1999).

[11] Justice Stephen Breyer, *Federal Sentencing Guidelines Revisited*, 11 Fed. Sent. R. 180, 1999 WL 730985 *10-11 (Jan./Feb. 1999).

Courts from around the country have found guideline sentences to be unreasonably high for the defendant being sentenced by the court, particularly in the case of first time offenders. *United States. v. Paul*, 239 F.Appx 353 (9th Cir. 2007) (defendant's 16-month sentence, the top end of the guideline range for unlawful receipt of federal funding, was unreasonably high because defendant was a first-time offender, returned the funds, and displayed remorse); *United States v. Jewell*, 2009 WL 1010877 (E.D.Ark. April 15, 2009) (defendant sentenced to 30 months in prison for aiding and abetting tax evasion, because guideline range near the statutory maximum of 5 years was inappropriate for first time offender); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006) (non-guideline sentence of 2 months in jail and 4 months home confinement, where advisory range was 10-14 months for marijuana offense by defendant who had never been confined, was sufficient to impress on him the seriousness of his crime and deter him from re-offending); *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration).

As in these cases, Mr. Young is a first time offender. Because Mr. Young has never been to prison, a lesser prison term will be sufficient to accomplish the goal of deterrence, while still holding Mr. Young accountable for his conduct.

III.    <u>The sentence should address the need to provide restitution to the victims of the offense</u>.

A.    A shorter term of imprisonment would enable the defendant to make restitution.

*United States v. Menyweather*, 431 F.3d 692, 702 (9th Cir. 2005) (in case of embezzlement of $500,000, after *Booker*, no abuse for court to depart downward by 8 levels to probation in part because "a sentence of probation may have made defendant better able to provide restitution to

the victims, *see* 18 U.S.C. § 3553(a)(7)"); *United States v. Coleman*, 370 F. Supp. 2d 661 (S.D.Ohio 2005) (defendant convicted of conspiracy to violate FDA Act involving misbranded drugs; guideline range was 6-12 months; sentenced to probation, community treatment center and house arrest in part because "five years of probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford Defendants more time to pay restitution. 18 U.S.C. § 3553(a)(7)"); *United States v. Peterson*, 363 F. Supp. 2d 1060 (E.D. Wisc. 2005) (defendant, a gambling addict in counseling, pled guilty to defrauding bank of $80,000; guideline range was 12 to 18 months, court imposed one day in prison and 5 year supervised release term in part so defendant would not lose job and could pay restitution.); *United States v. Blackburn*, 105 F. Supp. 2d 1067 (D.S.D. 2000) (defendant pled guilty to failure to pay child support and guideline called for 12-18 months; court departed to probation to ensure defendant would be subject to longer term of supervision, finding imprisonment counterproductive towards payment of child support).

Mr. Young will not have any opportunity to begin making restitution while he is incarcerated. Mr. Young hopes that he will be able to become gainfully employed upon his release from prison. Mr. Young is now sixty-two years old. If the Court were to sentence Mr. Young to five years imprisonment, Mr. Young would be sixty-seven upon his release. The longer Mr. Young is imprisoned, and the older he becomes, the less likely it is that Mr. Young will be able to secure employment. Without employment, the hopes of paying restitution are slim.

B.    Restitution for life is akin to a life sentence.

The Southern District of New York handled a case very similar to that currently at hand. In <u>United States v. Adelson</u>, 441 F. Supp. 2d 506 (SDNY 2006), the defendant was charged in a

securities fraud case. Although the guidelines called for a life sentence, the court imposed a forty-two month sentence. Id. Additionally, the court ordered that the defendant make restitution in the amount of fifty million dollars. Id. The court indicated that because of the substantial restitution payments ordered, the court essentially imposed "a life sentence." Id. at 514.

The court reasoned that when "the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in *section 3553(a)*, as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." Id. at 515.

Mr. Young asks this Court to make the same considerations. In looking at the factors under 18 U.S.C. § 3553(a), a reasonable and fair sentence is one that is significantly lower than the guideline recommendations.

////

////

////

////

////

////

////

////

////

////

CONCLUSION

The defendant, Michael Young, would respectfully ask this court to consider a sentence of sixty (60) months imprisonment.


Respectfully, submitted this the 28th day of December, 2009.

RANDALL WORTMAN, PC

BY: /s/ Samuel J. Randall

SAMUEL J. RANDALL, IV
NC STATE BAR#     25486
324-B Village Road
Leland, NC  28451
Telephone:  (910) 399-1863
Facsimile:   (910) 399-1866
nccrimlaw@yahoo.com

CERTIFICATE OF SERVICE

The Undersigned hereby certifies that a copy of the defendant's sentencing memorandum was

served upon Clay Wheeler, Assistant Untied States Attorney via CM/EFC.

This the 28th day of December, 2009.

RANDALL WORTMAN, P.C.

BY:  /s/ Samuel J. Randall

SAMUEL J. RANDALL, IV
NC STATE BAR#     25486
324-B Village Road
Leland, NC  28451
Telephone:  (910) 399-1863
Facsimile:  (910) 399-1866
nccrimlaw@yahoo.com